# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Vivian Dorothea Grover-Tsimi,            Civil No. 09-3544 (JRT/SRN)

        Plaintiff,

v.                                        **REPORT AND**
                                                 **RECOMMENDATION**

Millpond Partners (a/k/a Millpond
Apartments, Ltd.); American Investment
Management Services Company; and
Millpond Apartments,

        Defendants.

_____

Vivian Dorothea Grover-Tsimi, 210 1ˢᵗ Avenue NW, #302, New Prague, MN 56071,
Plaintiff, *pro se*.

Roger H. Gross, and Brock Alton, Gislason & Hunter LLP, 701 Xenia Ave. S., Suite 500,
Minneapolis, MN 55416, for Defendants.

_____

SUSAN RICHARD NELSON, United States Magistrate Judge

      This matter is before the Court on Plaintiff's motion for entry of default judgment

(Doc. No. 27) and Defendants' motion for summary judgment (Doc. No. 37). For the

reasons stated below, this Court recommends that Plaintiff's motion be denied and

Defendants' motion be granted.

## I.       FACTUAL AND PROCEDURAL BACKGROUND

      In December 2009, Plaintiff, proceeding *pro se*, filed her Complaint alleging what

she has identified as eighteen separate claims with respect to her relationship as a tenant

of Defendant Millpond Apartments, a residential housing complex. Plaintiff moved into

the complex in March 2009, and remains a tenant there apparently to this day.

The complex, which is located in New Prague, Minnesota, is owned by Defendant Millpond Partners and managed by Defendant American Investment Management Services Company. Millpond Apartments offers housing largely to elderly persons but also to some disabled individuals. It provides housing to low income and disabled individuals pursuant to the Department of Housing and Urban Development's Section 8 program and its state counterpart under the Minnesota Housing Finance Agency.

In June 2010, Plaintiff filed a motion for entry of default judgment. (Doc. No. 27.) And Defendants have now moved for summary judgment. (Doc. No. 37.)[1]

## II.    DISCUSSION

### A.    Default Judgment

Plaintiff has moved for a default judgment, claiming that Defendants' Answer "was due by April 27, 2010." (Doc. No. 27.)[2] Plaintiff served Defendants on April 7, 2010, and contends that the Summons itself requires an answer "'[w]ithin 20 days after service.'" (Id.) But the Summons plainly provides that an answer is due "[w]ithin *21 days after service.*" (Doc. No. 10 (emphasis added).) This is, of course, consistent with Rule 12. Fed. R. Civ. P. 12(a)(1)(A)(I). Accordingly, the Clerk properly declined to enter Defendants' default and Plaintiff's motion should be denied.

---

[1]    The Court also notes that Plaintiff filed, on May 26, 2010, a non-dispositive motion for an order compelling disclosure. (Doc. No. 20.) The Court has addressed that motion in a separate order.

[2]    Plaintiff apparently requested the Clerk of Court, under Rule 55(a), to enter a default against Defendants. Only if the Clerk first properly enters default may default judgment then be issued under Rule 55(b). Fed. R. Civ. P. 55.

**B.  Summary Judgment Standard**

Defendants move for summary judgment on "each and every count of her Complaint."  (Doc. No. 39.)  Plaintiff neither filed any response to Defendants' motion nor appeared at the hearing on that motion (as well as her own).

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  Summary judgment is appropriate if the non-movant "fails to make a sufficient showing to establish the existence of an element essential to that parties' case and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

Here, the precise issue is not whether Plaintiff has made "a sufficient showing," but rather how the Court should treat her failure to make *any* factual showing in response to Defendants' motion.

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must–by affidavits or as otherwise provided in this rule–set out specific facts showing a genuine issue for trial.  If the opposing party does not so respond, summary judgment should, *if appropriate*, be entered against that party.

Fed. R. Civ. P. 56(e)(2) (emphasis added).  As the Supreme Court has explained, where the movant has properly supported their motion, the non-movant "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

Not only has Plaintiff procedurally defaulted by relying exclusively on her Complaint, she has not availed herself of the procedure afforded by Rule 56(f), namely, to file an affidavit explaining the specific reasons that she cannot present facts essential to justify her opposition to Defendants' motion. Fed. R. Civ. P. 56(f).

The Court recognizes that Plaintiff is proceeding *pro se* and that such litigants are usually entitled to a certain leeway in their compliance with the applicable rules. Nevertheless, an outright failure to respond in any fashion to a dispositive motion is not lightly condoned, particularly where Plaintiff earlier has demonstrated a certain ability to draft, file and serve legal documents and participate in legal proceedings–as evidenced here by her 24-page Complaint premised on complicated federal statutes and several motions. (Doc. Nos. 1, 2, 7, 13, 20, 26, & 27.) Plaintiff also personally participated in the June 10, 2010 pretrial scheduling conference. (Doc. Nos. 31, 32.)

Moreover, a *pro se* litigant is not entitled to be excused entirely from the procedural and substantive requirements imposed by the applicable federal rules and statutes. The Court cannot merely assume that Plaintiff is innocently unaware of her obligation to respond to Defendants' motion or the consequences of a failure to do so. The Court notes that Plaintiff adopted a recalcitrant posture early in this litigation and has remained largely silent and non-responsive since her unsuccessful appeal in July 2010. In fact, she has refused service of this Court's Pretrial Scheduling Order. Thus, the Court is not inclined to excuse her failure to provide any response of any kind to Defendants' motion for summary judgment and her failure to appear at the hearing on that motion.

The Court understands that a *pro se* plaintiff's procedural default in not responding to a defendant's summary judgment motion, standing alone, might not necessarily warrant summary judgment. But Defendants have supported their motion with affidavits and the relevant documents that–in conjunction with Plaintiff's outright non-response–demonstrate that entering summary judgment against Plaintiff is "appropriate" under Rule 56(e)(2). Cf. Byrd v. Brandeburg, 922 F. Supp. 60, 62 (N.D. Ohio 1996) (granting summary judgment on FHA claims where non-movants "failed to make any response to the plaintiffs' motion for summary judgment" and the court's "examination of the pleadings and the [movants'] motion demonstrates" entitlement to summary judgment). Where a defendant denies the allegations of the complaint and a plaintiff then fails "to respond with evidence in support of [her] claim," the court is justified in granting summary judgment. Abbott v. Gale, 896 F.2d 323, 326 (8th Cir. 1990) (also noting that plaintiff "made no effort to supplement the record by affidavit or otherwise, nor did [she] seek a continuance [under Rule 56(f)] to permit additional discovery"). This rule has been enforced even against *pro se* plaintiffs where the defendant's motion itself is "sufficient to show that no genuine issue of fact exists." Davies v. Valdes, 462 F. Supp. 2d 1084, 1087 & n.4 (C.D. Cal. 2006).

Here, not only do the materials filed in support of the motion show that Defendants are entitled to judgment as a matter of law, many of the factual allegations provided in Plaintiff's Complaint, even if taken as true, serve only to undermine her own claims rather than support them.

## C.    Fair Housing Act Claims

### 1.    Construing Plaintiff's Complaint

On their face, the bulk if not the entirety of Plaintiff's claims expressly allege violations of the Fair Housing Act, which, as relevant here, essentially prohibits various types of discrimination in rental housing on the basis of "race, color, religion, sex, familial status, or national origin" or "because of a handicap" of the renter.  42 U.S.C. § 3604.[3]  The FHA also declares it unlawful to "coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, . . . any right granted or protected by section" 3604.  Id. § 3617.

The Act authorizes a private right of action by an aggrieved person and permits the recovery of compensatory and punitive damages and an award of appropriate injunctive relief.  42 U.S.C. § 3613.  Plaintiff is an African-American woman who suffers from supraventricular tachycardia.  (Doc. No. 1, at 2, 15.)  She also claims other disabilities, including post-traumatic stress disorder, and an "acute heart condition" (perhaps only the tachycardia).  (Id.)  Thus, she appears to have standing under the FHA.  See Havens Realty Corp. v. Coleman, 455 U.S. 363 (1982).

---

[3]    Subsections 3604(a)-(e) declare various actions based on (as relevant here) race, religion or handicap to be unlawful.  Section 3604(a) prohibits a discriminatory refusal to rent.  Section 3604(b) prohibits discrimination in the "terms, conditions or privileges" of a rental.  Section 3604(c) prohibits any discriminatory "notice, statement or advertisement" regarding rentals.  Section 3604(d) prohibits representing that a unit available for inspection or rental is not "in fact so available."  Section 3604(e) is not relevant here.  Subsection 3604(f), added in 1988 by the Fair Housing Amendments Act, focuses on various forms of discrimination against a "renter because of a handicap."  United States v. Branella, 972 F. Supp. 294, 297 & n.4 (D.N.J. 1997) (providing brief history of expansion of the statutory protections).

Although Plaintiff has denominated some eighteen separate counts, her Complaint, properly construed, supports only five Section 3604 claims of discrimination on the basis of race, religion, and disability, as well as two Section 3617 claims of harassment and intimidation for exercising her Section 3604 rights. Much of what she has delineated as a separate "count" is not a recognized cause of action. For example, Count XVIII simply seeks punitive damages under the FHA (as well as relief in the form of donations to particular charitable organizations), but does not assert any new underlying substantive theory of liability. Likewise, Counts XV, XVI and XVII seek compensatory damages under the FHA and do not allege any substantive claim in addition to those stated in previous counts.

Similarly, Counts IX and X allege Plaintiff's pain and suffering as a result of the violations of the FHA she has claimed elsewhere, while Count XI asserts "emotional injury" due to such violations. Count XII simply claims Defendants acted with "reckless or callous indifference" when violating the FHA.

Counts XIII and XIV also are not premised on any particular underlying substantive theory of liability, but rather only assert variations on the legal principle of *respondeat superior*. Here, there is no dispute that Defendants would be liable for the acts of their respective employees and agents in violation of the FHA. See Meyer v. Holley, 537 U.S. 280, 282 (2003) (holding that FHA "imposes liability without fault upon the employer in accordance with traditional agency principles, *i.e.*, it normally imposes vicarious liability upon the corporation but not upon its officers or owners").

Finally, Count VI, while labeled "Breach of Lease," discloses that it is in fact a FHA claim premised on discrimination against Plaintiff compared to another specified tenant with respect to the provision of a parking space and compared to other unspecified tenants with respect to maintenance of their respective apartment units.[4]

This leaves seven claims, that is, Counts I, II, III, IV, V, VII and VIII. The Court has construed Plaintiff's Complaint, giving due consideration to her *pro se* status, to assert claims under the FHA alleging various acts of discrimination based on (1) race (Count II), (2) religion (Count III), and (3) disability (Count IV). Similarly, Count I alleges discrimination but without specifying whether the basis is race, religion or disability. While Count V is labeled as a claim under the Americans with Disabilities Act of 1990 ("ADA"), any fair review discloses that it actually asserts discrimination under the FHA based on her alleged disability.[5]

---

[4]     The Court therefore does not understand Count VI to constitute a separate breach-of-contract claim under state law. And even if it were to construe Count VI as properly raising such a state-law claim, the Court would, after granting summary judgment on all of the federal claims, dismiss that claim without prejudice under 28 U.S.C. § 1367(c) (permitting dismissal without prejudice of state-law claims following early dismissal of plaintiff's federal claims). Likewise, Plaintiff frequently claims that particular violations of the FHA constitute a breach of the lease. (Doc. No. 1, at 5, 7, 9, 10, 13, 14.) But nothing in the FHA supports the claim that a violation of that federal anti-discrimination statute necessarily also constitutes a breach-of-contract claim under state law. And any such valid residual state-law claims would be dismissed without prejudice under Section 1367(c).

[5]     While Count V cites the ADA for its definition of who is protected as disabled, it expressly alleges a violation of the FHA, under which the prohibition of discrimination extends to that based on disability. And Count IV already alleges violations of the FHA based on disability. The Court therefore does not understand Count V to separately raise any properly-alleged ADA claim. In any event, the ADA

(continued...)

8

The Court also construes her Complaint to assert claims under the FHA alleging "invasion of privacy" (Count VII) and "discriminatory harassment" (Count VIII). Count VIII, which cites no particular FHA provision but recounts the various events and allegations addressed elsewhere in the Complaint as an attempt to intimidate Plaintiff, is best understood as premised on 42 U.S.C. § 3617, which prohibits the coercion or intimidation of, threats to, or interference with, a person exercising the rights granted by, as relevant here, Section 3604. And Count VII, which expressly cites Section 3617, is similar in that it alleges that Defendants tampered or otherwise interfered with Plaintiff's receipt of her mail. The Court understands Count VII to constitute a particular form of the coercion, intimidation or interference prohibited by Section 3617 and generally

---

[5](...continued)
would not apply here as it does not extend to private entities in the business of providing residential rental properties. The ADA prohibits discrimination against the disabled in various contexts such as employment, public services and public accommodations. With respect to public services, "the ADA prohibits disability discrimination only in the services of a 'public entity.'" O'Connor v. Metro Ride, Inc., 87 F. Supp. 2d 894, 899 (D. Minn. 2000); 42 U.S.C. § 12132. The statute defines such an entity as "any State or local government" and "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1). Defendants are not public entities under the ADA. With respect to public accommodations under 42 U.S.C. § 12182, the fact that Defendants own or operate an apartment complex does not bring them within the reach of the ADA "since apartments and condominiums do not constitute public accommodations within the meaning of the Act." Independent Housing Services of San Francisco v. Fillmore Center Assocs., 840 F. Supp. 1328, 1344 & n.14 (N.D. Cal. 1993) (explaining that while definition of "public accommodation" is broad under 42 U.S.C. § 12181(7), "the legislative history of the ADA clarifies that 'other place of lodging' does not include residential facilities"). Nor does the fact that Plaintiff participates in the Section 8 housing program render Defendants within the reach of the Act. Reyes v. Fairfield Properties, 661 F. Supp. 2d 249, 263-64 & n.5 (E.D.N.Y. 2009). Thus, there is no basis for an ADA claim here.

alleged in Count VII.[6]

In sum, Plaintiff's Complaint alleges the following claims: (1) a specific claim of discrimination under Section 3604 on an unspecified basis (Count I); (2) general claims of discrimination under Section 3604 based on race, religion and disability (Counts II, III & IV); (3) a specific claim of discrimination under Section 3604 based on disability (Count V); and (4) two claims (one general and one specific) of coercion and harassment under Section 3617 (Counts VII & VIII).[7] Finally, while Plaintiff also peppers her Complaint with allegations of Defendants' "verbal aggressiveness," "coarse language" and other slights (e.g. Doc. 1, at 12), such *de minimus* affronts are not cognizable under the FHA, at least not absent some further factual elaboration of how they could fit any of the precisely-defined forms of discrimination under the FHA.

### 2. Plaintiff's Claims Cannot Survive Summary Judgment

Within this framework, the Court will proceed to address the particular individual events and actions of Defendants of which Plaintiff complains, which can be divided into direct discrimination claims, reasonable accommodation claims, and retaliation claims.

---

[6]      Count VII also expressly purports to be based on 18 U.S.C. § 1702. But Section 1702 is a criminal prohibition against mail tampering that does not expressly also provide for a civil cause of action to a private party aggrieved by any such violation. But this is of little consequence because, as explained above, the court understands Plaintiff's allegations of mail tampering to fall within the reach of the FHA's prohibition of intimidation and interference with her rights as a tenant under the FHA.

[7]      A "specific" claim, such as Count I, alleges a particular factual instance of discrimination, but without necessarily identifying the particular trait on which the discrimination is allegedly based. A "general" claim, such as Counts II through IV, simply alleges discrimination in violation of the FHA, often (but not necessarily always) based on a particular trait such as race, but without limiting the claim to specific facts.

### (a) Discrimination Claims

The Court first notes that discrimination claims under the FHA are generally subject to the same analysis as such claims under other federal statutes. Discrimination claims are often divided into disparate treatment and disparate impact claims, but here Plaintiff attempts no such classification. In light of her *pro se* status, the Court does not simply assume that she intended only to assert disparate-treatment claims, but on the present record, which for her part consists solely of her Complaint, there is no basis to approach her allegations as presenting disparate-impact claims. Such a claim first requires the Plaintiff to establish that the objectionable actions resulted in a disparate impact on her compared to a relevant population–that is, that a facially-neutral policy had a significant adverse impact on members of a protected minority group. Gallagher v. Magner, ___ F.3d ___, 2010 WL 3419820, *6 (8th Cir. Sept. 1, 2010). There is simply no evidence of record here on which to make the comparative-outcome analysis on which such claims turn. See id. at *7-10 (providing extensive analysis of disparate-impact claims under the FHA).

Disparate treatment claims under the FHA are tested under the same framework as Title VII disparate treatment claims: "did the defendant(s) treat [Plaintiff] less favorably than others based on their race, color, religion, sex or national origin." Id. at *3. "Proof of discriminatory purpose is crucial for a disparate treatment claim." Id. Defendants would be entitled to summary judgment "if the plaintiff cannot produce either (a) direct evidence of discriminatory intent, or (b) indirect evidence creating an inference of

discriminatory intent under the *McDonnell Douglas* burden-shifting framework." Id. Moreover, there must be some connection between the Defendants' improperly-motivated statements or actions (be they based on race, religion or disability) and some policy or action of theirs that caused Plaintiff's injury. See id. at *4 (dispensing with most of defendants' "statements that purportedly show the[ir] 'discriminatory attitude'" "because they have little or no connection to [defendants'] policy or action").

Here, Plaintiff has produced no evidence of intent of either form and even construing the mere allegations of her Complaint as factual evidence, her claims cannot survive summary judgment. Plaintiff first alleges that Defendants "have refused to rent to Plaintiff after making a bona fide offer" in violation of Section 3604(a) and that they told her "that only one of the two dwellings was available for inspection" in violation of Section 3604(d). (Doc. No. 1, at 16 (Count I).) She also asserts that once they had rented an apartment to her, they "subjected [her] to unsubstantiated sudden eviction" on two occasions. (Id.)[8]

But Defendants did not refuse to rent her an apartment. Plaintiff first inquired about renting an apartment in early February 2009. Although there was some delay due to her inability to verify the disabilities that were required for her to obtain Section 8 housing, that issue was soon resolved. She signed a lease and moved in on March 9, 2009. While Plaintiff "believe[s] that race played the primary role in the initial" delay in

---

[8]     Count I, unlike Counts II through IV, does not expressly identify whether the alleged discrimination was based on race, religion or disability. But any such omission or imprecision is irrelevant because Defendants are entitled to judgment on Count I on any such basis.

renting the apartment (Doc. No. 1 at 4), such unsubstantiated allegations cannot justify proceeding to trial in the face of Defendants' affidavits providing facts explaining the approval process for disabled tenants.

And the mere fact that the property manager offered to allow Plaintiff to view only one of two available units hardly amounts to discrimination in violation of the FHA, particularly in light of the fact that the property manager then promptly informed Plaintiff that "'the unit . . . is yours if you still want it.'"  (Doc. No. 1, at 3.)  There is no basis in the record to conclude that Defendants, by only showing Plaintiff one of two available units, segregated or otherwise improperly steered her to a particular unit based on race, religion, or disability.  Defendants simply "showed her one of the two apartments that were available at the time."  (Doc. No. 40, ¶ 3 (Affidavit of Barbara White (further explaining that she "never indicated that the other apartment was not available" but "simply showed [Plaintiff] one apartment as an example" of available units)).)

Count I also claims Plaintiff was subjected to at least two instances of "unsubstantiated sudden evictions," although without any further elaboration or explanation of such events.  (Doc. No. 1, at 16.)  It would appear that she refers to the fact that after Defendants first offered her an apartment, apparently under the assumption that her purported disabilities could be verified, they informed Plaintiff that they could not "'let [her] move in' without a justifiable reason."  (Doc. No. 1.)  But as Defendants explain, they were simply unable to obtain without substantial time and effort the verification–necessary for Section 8 housing–of Plaintiff's purported disabilities.  (Doc.

No. 40, ¶¶ IV-VII, XIII-XIV.)  And as Plaintiff herself notes, the problem was soon resolved as Defendants then informed her that they "ha[d] all [her] verification forms back and would like to set up a date for [her] to move in."  (Doc. No. 1, at 4.)  Even taking the allegations of Plaintiff's Complaint as true, they establish at most her misunderstanding over the requirements of Section 8 housing and fail to reflect any form of discrimination actionable under the FHA.  And, of course, Defendants never actually evicted her, or even formally initiated eviction proceedings.  Nor did Plaintiff vacate the premises claiming constructive eviction.  Cf. Bloch v. Frischholz, 587 F.3d 771, 777-78 (7th Cir. 2009) (noting that defendants' argument that plaintiffs "were never evicted, actually or constructively, because they never vacated the premises" is "well-taken").  "[I]t is well-understood that constructive eviction requires surrender of possession by the tenant."  Id. at 778.

The other instance presumably concerns Defendants' request that Plaintiff sign a new lease in June 2009.  Plaintiffs essentially contends that she "was forced to sign the new lease to avoid sudden eviction," "a lease that according to HUD should have been the first lease and only lease Plaintiff was to sign on March 9, 2009," when she originally moved in.  (Doc. No. 1, at 10.)  As Defendants explain, at the time Plaintiff moved in they were "using a form lease agreement provided by the MHFA."  (Doc. No. 40, ¶ IX.)  But in June of 2009, the property manager "learned that we had been using an incorrect lease" and that they "had to substitute the MHFA lease with Model Lease for Subsidized Programs from HUD."  (Id., ¶ XVI.)  The Court is unable to construe this incident, at

most a simple misunderstanding by Plaintiff of Defendants' mistake, as any form of discrimination. Perhaps most importantly, Plaintiff was not treated any differently in this regard than any other renter. (Id. ("I had all the residents sign the new lease.").) And again, there was no eviction, actual or constructive.

Count II alleges racial discrimination by virtue of Defendants "renting housing in the use of racist language; [and] making statements that indicate a preference, limitation, or discrimination or an intention to" engage in such actions in violation of Section 3604(c). (Doc. No. 1, at 16.) Section 3604(c) makes it unlawful to "make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement" with respect to a rental "that indicates any preference, limitation, or discrimination based on," as alleged here, race. 42 U.S.C. § 3604(c).

Plaintiff's Complaint is confined to oral statements and the record does not identify any printed or published notices or advertisements. Moreover, nowhere in her Complaint does Plaintiff disclose that Defendants used any blatant racial epithets or engaged in other actionable behavior based on racial animus. Rather, her Complaint alleges only that the property manager, while filling out the required forms, inadvertently identified "Plaintiff as White and Elderly (Plaintiff is African-American and not elderly)." (Doc. No. 1, at 6.) As the property manager explains, she inadvertently retained those selections (on what presumably is an on-line HUD form that defaults to the information entered from the prior use and thus must be changed manually in any subsequent use), which accurately reflected the race and age of many of Defendants' previous tenants.

(Doc. No. 40, ¶ XI.)  And in any event, it is far from clear how mistakenly identifying an African-American as White could constitute racial discrimination by white people.  As Plaintiff's own Complaint explains, if there was any racial preferencing by Defendants, it was *in favor of* Plaintiff being black.  (Doc. No. 1, at 6 (explaining that Gerrard Yaeger, President of Defendant AIMS, told Plaintiff he "was glad when [her] application came through" because Plaintiff's presence would help the racial balance that existed in New Prague and Millpond and presumably placate the government officials that oversaw the relevant programs).)  To support a discrimination claim under Section 3604(c), the race-related statement must be related to the decisional process in an adverse manner.  See Harris v. Itzhaki, 183 F.3d 1043, 1055 (9th Cir. 1999).[9]  None exists here.

Count III generally asserts religious discrimination in violation of Section 3604(c) of the FHA as well as interference with her FHA rights in violation of Section 3617. (Doc. No. 1, at 16.)  Plaintiff, who has not identified her religious views (if any), notes several instances where the resident property manager or other tenants inquired of Plaintiff's religious affiliation, or invited her to religious services or events of a particular denomination in which the manager or tenant participated.  (Id. at 7-9.)

As the property manager explains, something led her to believe Plaintiff might be a born-again Christian, so she mentioned local churches to Plaintiff, as she does "with all

_____

[9]     Plaintiff also relies on Yaeger's statements that the local community, historically comprised of Czechoslovakians and Germans, has "not been accepting of African-Americans."  (Doc. No. 1, at 6-7.)  But this comment, even if factually true, does not reflect *Defendants'* discriminatory animus.  Rather, it is Yaeger's characterization of the racial animus of third parties and his explanation of why her status as an African-American was advantageous for Defendants to redress the racial imbalance in that area.

new residents" regardless of their denomination. (Doc. No. 40, VIII.) She also invited Plaintiff to attend church with herself and her husband. (Id.)

With respect to such statements or actions by fellow tenants, Plaintiff's FHA claims are misdirected as the statute does not attempt to regulate the behavior between such parties.[10] With respect to such statements or actions by any employee or other agent of Defendants, even an innocent inquiry into a tenant's religious beliefs or a friendly invitation to participate in particular religious services is perhaps ill-advised. But to survive summary judgment on a claim of religious discrimination under the FHA requires more than allegations of such mere inquiries or invitations. Plaintiff must identify evidence of discrimination on the basis of her religion, which it appears she disclosed neither to Defendants or presently to this Court. But here there simply is no evidence that Defendants took any discriminatory action against her based upon her religious convictions, assuming they could have determined what they might be. None of the inquiries or invitations reflect a preference, limitation or discrimination by Defendants for tenants of a religious affiliation other than that of Plaintiff.

Moreover, Plaintiff has identified no adverse action stemming from any such preference. Defendants rented the apartment to her and she remains a tenant to this day. And whatever dissatisfaction Plaintiff might have with the conditions of the apartment itself or her treatment at the complex cannot be traced to any religious discrimination.

---

[10] There is no evidence that other tenants were so acting at the behest of any of the Defendants.

**(b)      Reasonable Accommodation Claims**

As discussed above, Counts IV and V alleged discrimination in violation of the FHA based on Plaintiff having a disability.  The FHA generally prohibits discrimination with respect to housing "because of a handicap" of the renter.  42 U.S.C. § 3604(f).  Such prohibited discrimination extends to "a refusal to make reasonable accommodations" in services that may be necessary to afford the renter an "equal opportunity to use and enjoy a dwelling."  Id. § 3604(f)(1), (3).  The prohibition of Section 3604(c) against discriminatory notices, statements or advertisements also extends to protect disabled renters.  Id. § 3604(c).

Here, Count IV appears confined to the allegation that Defendants refused, in violation of Section 3604(f)(3)(B), "to permit [a] reasonable modification of" her apartment unit that she requested due to one of her purported disabilities.[11]  Plaintiff asked Defendant to install a lock on her bedroom door, claiming that her anxiety precluded her from sleeping without such precautions, but that they refused.

The FHA, as amended, requires such accommodations only if they are reasonable and necessary to afford the handicapped person the equal opportunity to use and enjoy a dwelling.  Oconomowoc Residential Programs, Inc. v. City of Milwaukee, 300 F.3d 775, 783 (7th Cir. 2002).  "The burden is on [Plaintiff] to show that the accommodation [she] seeks is reasonable on its face."  Id.  If the Plaintiff makes such a showing, Defendants

---

[11]      Although Count IV also cites Section 3604(c), the allegations of that count do not appear to involve any discriminatory "notice, statement, or advertisement" based on a disability redressable under that particular provision.

"must come forward to demonstrate unreasonableness or undue hardship in the particular circumstances." Id. (noting similarity of its approach to that of Eighth Circuit).

As Defendants explain, the management company does not permit such locks for safety reasons, as they could prevent access during an emergency such as a fire. (Doc. No. 40, ¶ XII.) Moreover, their refusal is not discriminatory because "[n]o bedroom door at [the complex] has a lock installed." (Id.) Finally, and perhaps most importantly in terms of the legal requirements for such a "reasonable modification" claim under Section 3604(f)(3), the Plaintiff must prove she is disabled within the meaning of the FHA. Schwarz v. City of Treasure Island, 544 F.3d 1201, 1218-19 (11th Cir. 2008). But here, while Plaintiff eventually was able to provide confirmation of her heart condition, she never supported with medical evidence her claimed post-traumatic stress disorder that purportedly required the lock on her door.[12]

Plaintiff also complains of Defendants' failure to remedy the second-hand smoke problem emanating from a neighbor's apartment, claiming that it aggravated her heart condition.[13] Although Plaintiff asserts her "general understanding that the complex" was a smoke-free building, she offers no factual support for any such "understanding."

---

[12]    The Court also doubts whether her particular request–to have a lock on her *bedroom* door–is reasonable on its face insofar as she is presumably already capable of locking the door to her apartment and securing whatever windows might be accessible from the outside.

[13]    While this particular grievance is plausibly encompassed within Count IV, Plaintiff also delineates a separate claim, Count X, "Pain and Suffering - Disregard for Direct Threat to Health and Safety," that is expressly devoted to the alleged impact of second-hand smoke on her heart condition.

Defendants explain that the apartment complex "is not a smoke-free apartment, and residents are permitted to smoke inside their individual units with the window open." (Doc. No. 40, ¶ XVII.)  Accordingly, Plaintiff would have to work out an agreement with her smoking neighbor.  (Id.)  Nevertheless, Defendants "had maintenance place an extra air freshener near her door."  (Id.)  Plaintiff presumably seeks, although without expressly stating as much, to have Defendants compel other residents to stop smoking in their apartments.  But Plaintiff has not shown she could be entitled to any such remedy that would inevitably infringe upon another tenant's rights.  Groner v. Golden Gate Gardens Apts., 250 F.3d 1039, 1046 (6th Cir. 2001) ("'[A]s a matter of law, the [neighbor's] rights did not have to be sacrificed on the altar of reasonable accommodation.'").

Count V is apparently based on the allegation that "Defendants initially refused to accept Plaintiff's record of her impairment" and then after eventually renting the unit to her "threatened sudden eviction."  (Doc. No. 1, at 17.)[14]  Defendants explain that because Plaintiff is not elderly she would qualify for Section 8 housing only if "she was handicapped."  (Doc. No. 40, ¶ IV.)  In response to Plaintiff's claims of suffering from "a mental illness and a heart condition," the property manager asked her to complete two forms required by HUD and its Minnesota counterpart in order to verify her disability status.  (Id. ¶ V.)  But Plaintiff has never been able to provide Defendants with any verification from any of her treating physicians of her claimed mental illness.  (Id. ¶ VI.)  With respect to physical disabilities, Defendants eventually received adequate

---

[14]      Plaintiff premises this claim on the ADA as well as Section 3617.  As discussed above, the ADA does not apply here.  See supra note 5.

confirmation that Plaintiff suffers from supraventricular tachycardia.  (Id. ¶ XIV.)  The fact that Defendants required verification of disabilities in order to rent Plaintiff the apartment under the Section 8 program hardly constitutes discrimination against her on the basis of her alleged disabilities.  And there is no evidence that Defendants treated Plaintiff any differently from any other Section 8 tenant subject to the same requirements.

Nor would the fact that Defendants required verification of her disabilities raise a Section 3617 claim of retaliation against her for somehow exercising her Section 3406 rights.  Being disabled does not create an exception to the requirement that Defendants verify her disability in order to legally rent to her under the Section 8 program.

### (c)      Section 3617 Retaliation Claims

As noted above, Counts VII and VIII are Section 3617 retaliation claims premised on allegations that Defendants coerced, intimidated or interfered with Plaintiff's exercise of her rights under Section 3604, including the specific allegation that Defendants tampered with Plaintiff's mail.  To establish a Section 3617 retaliation claim under the FHA, Plaintiff must show she was engaged in a protected activity, that Defendants took adverse action against her, and that a causal connection exists between the protected activity and the adverse action, *i.e.*, that a retaliatory motive played a part in the adverse action.  Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown, 294 F.3d 35, 54 (2d Cir. 2002), cited in Gallagher v. Magner, ___ F.3d ___, 2010 WL 3419820, *10 (8th Cir. Sept. 1, 2010).

Although the Court will assume Plaintiff was exercising her Section 3604 rights, it

is far from clear that Defendants took adverse action against her, and she has produced no evidence of a causal connection, that is, that a retaliatory motive on their part led to any adverse action.  Plaintiff recites a litany of accusations in Count VIII that, in the absence of any response to Defendants' motion, amounts to little more than unsupported scattershot allegations of retaliation.  While she recounts various general acts of wrongdoing, there is nothing in the record to connect any such actions, even assuming that they occurred, to any interference with Plaintiff's exercise of her Section 3604 rights. In short, there is no factual support for any retaliatory motive.  "Without such facts to demonstrate that there is a genuine issue for trial, [Plaintiff's] mere allegations [of retaliation and harassment] cannot defeat summary judgment."  Robinette v. Jones, 476 F.3d 585, 591 (8th Cir. 2007).

With respect to the mail tampering alleged in Count VII, Plaintiff apparently alleges that Defendants withheld her packages.  (Doc. No. 1, at 11.)  Defendants' property manager explains, however, that the mail carrier formerly would leave packages for the tenants on a table near their mailboxes.  (Doc. No. 40, ¶ XV.)  In the Spring of 2009, someone opened a resident's packages before they could pick them up.  In response, the Post Office asked if they could leave the packages with the complex's management for safekeeping.  On this record–and again, Plaintiff has made no attempt to rebut Defendants' argument and supporting materials–Plaintiff has merely alleged that Defendants' actions were motivated by a discriminatory animus against her.  Such unsupported allegations cannot withstand summary judgment in the face of Defendants'

affidavits establishing that their actions were intended to protect her (and the other tenants') interests in the security of their incoming mail. And again, there is nothing in the record to even suggest that Plaintiff was treated differently than any other resident who received packages in the U.S. mail during this period.

## III.    CONCLUSION

The mere allegations of Plaintiff's Complaint, unsupported by even any attempt to rebut the argument and affidavits of Defendants' motion for summary judgment, fail to identify any genuine issue of material fact for trial on her claims under the FHA.

## IV.    RECOMMENDATION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.    Plaintiff's motion for default judgment [Doc. No. 27] be **DENIED**; and

2.    Defendants' motion for summary judgment [Doc. No. 37] be **GRANTED**.


Dated:   October 18, 2010                          s/ Susan Richard Nelson
                                                 SUSAN RICHARD NELSON
                                                 United States Magistrate Judge


Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and serving all parties by **November 2, 2010**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.